WHITNEY ET AL *vs.* OCEAN INSURANCE CO.

APPEAL FROM THE COURT OF THE FIRST JUDICIAL DISTRICT,
JUDGE BUCHANAN PRESIDING.

It is the duty of captains of steam-boats passing in and out of the mouth of the Mississippi, on arriving at the pilotage ground, to take on board a regular commissioned or competent pilot: otherwise it is a breach of the warranty of insurance which will discharge the underwriters.

It is not sufficient to show that the captain of the boat was skillful and experienced, to discharge the insured from their warranty of sea worthiness when the boat has been lost without taking a pilot on board.

This is an action by the owners and agents of the steam-boat Convoy, on a marine policy of insurance in the usual form, executed by the defendants, insuring said steam-boat on her voyage at and from New-Orleans through the mouth of the Mississippi river to Mobile and back. On her return voyage, and in endeavoring to enter the mouth of the Mississippi without taking one of the regular commissioned pilots, or any other but those belonging to the boat, she struck on the breakers and was entirely lost; and, as is alleged, by the perils insured against. The plaintiffs further show, that the defendants have become liable for the amount of the insurance, after deducting sales of the wreck, leaving nine thousand three hundred and sixty-two dollars, for which they pray judgment.

The defendants denied any liability as insurers; because the captain of said steam-boat, omitted and neglected to take on board a pilot on returning and entering the mouth of the Mississippi, a place of great difficulty and danger ; and that said boat was, in consequence, unseaworthy on said voyage at the time of the loss. They pray to be discharged from suit, and all liability.

Under these pleadings and issues there was a mass of testimony taken to show that the captain was skillful, and that the boat was not lost through any negligence, or in fact, for the

EASTERN DIST.
*March*, 1840.

WHITNEY ET AL.
*vs.*
OCEAN INS. CO.

want of a pilot. That it was not the usage and practice for Mobile boats to take on board the pilots commissioned and stationed at the mouth of the river. The cause was finally submitted to a jury under the direction of the court, who returned a verdict for the plaintiffs, allowing them the sum claimed. The defendants appealed from the judgment rendered on said verdict.

*Benjamin*, for the plaintiffs :

1. The seaworthiness of a vessel is always presumed, and the burden of proof of unseaworthiness is on the assurers. 1 *Phillips*, 116, *and cases there cited.*

2. If, then, the question of seaworthiness be left in doubt, plaintiffs must recover ; but the evidence is conclusive in their favor, and was so considered by the court and jury. It is not usual to take a pilot in the navigation in which plaintiffs' boat was engaged, and if usual, the captain is proved to have been a most skillful pilot.

3. The necessity for taking a pilot is matter of usage, dependent on the custom in the particular navigation in which the vessel is engaged. *See* 1 *Phillips*, 115–16 ; 2 *Phillips*, 117–18, *and particularly the case there cited from* 6 *Cowen's Reports, page* 270.

4. The judge's charge to the jury was in conformity with the principles above stated, and was rather unfavorable to the plaintiffs. Defendants have, certainly, no reason to complain of it.

*C. M. Conrad*, for the defendants :

1. That vessels entering or going out of the mouth of the Mississippi are bound to employ a pilot, both by general usage and by positive law. *See law of* 1805, *section* 5, 1 *Moreau's Digest*, 513; *section* 17, *Ibid.*, 517 ; *section* 20, *Ibid.*, 518 : *Law of* 1826, *passim, Ibid.*, 520–21, *&c.; Law of* 1837, *Session Acts, No.* 106, *page* 101.

If the plaintiffs relied on a special usage, excepting vessels trading to Mobile from this custom, they should have proved the existence of such an usage. But none such has been

proven, unless the frequent attempts of captains of steam-boats to evade the law and defraud the pilots of their just dues, are entitled to be called by that name.

2. If the insured was bound to employ a pilot, he was not discharged from that obligation by showing that the captain was an experienced navigator and was acquainted with the particular navigation. The vessel was bound to be provided with a competent captain, as well as with a competent pilot; but these two officers are distinct, and, a compliance with one of these obligations was not a compliance with the other. It would be extremely dangerous to allow the doctrine, that the obligation of the insured to employ a pilot when the aid of one is necessary, depends on the greater or less experience and skill of the captain. This would always be a question of fact of difficult decision, and would open the door not only to litigation, but to numberless frauds against shippers and underwriters. *Hughes on Insurance*, 200, 201.

3. The obligation of the master to employ a pilot, where it is necessary or usual to employ one, is in the nature of a warranty, the mere breach of which discharges the underwriter, even though the loss be not occasioned by that breach. *Hughes on Insurance*, 199, 233 ; *Marshall on Insurance, vol.* 1, *p.* 165–166.

But the present case is a very strong one for defendants, for the breach was willful, inasmuch as a pilot offered his services and they were rejected ; and, as the loss was occasioned by the want of one.

*Morphy, J.*, delivered the opinion of the court :

This is a suit on a policy of insurance on the steam-boat Convoy. The insurance was for a voyage from New-Orleans to Mobile and back to this port. On her homeward trip, and when about entering the mouth of the Mississippi, the boat was lost, as is alleged by the perils insured against, to wit : the perils of the sea.

The only question here turns on the seaworthiness of the boat, for not having had on board a competent pilot at the time the accident happened by which the boat was lost ; sea-

worthiness is an implied warranty in every policy of insurance; to constitute it, a vessel must not only be tight, staunch and strong, but must be provided with every thing necessary for the purposes of safe and secure navigation. It is a question of some mercantile interest, and comes before us, we think, for the first time.

The testimony shows that the Convoy, on her outward trip to Mobile, took a pilot at the Balize. That when returning to this port, she was hailed by a regular pilot-boat at about eleven o'clock in the night and at a distance of twenty miles off the Mississippi; that on the offer of a pilot, the captain answered that he had no use for one, but that his boilers being damaged and out of order, he requested the pilot-boat to keep alongside of him until daylight, lest he should be blown to sea; that the offer of a pilot was once or twice repeated, and again refused by the captain; that after giving the course and distance to the light-house, the pilot-boat left the Convoy; that the next morning at about three o'clock, the boat reached the Balize, came to anchor, and shortly afterwards attempted to cross the bar without waiting for a pilot, or making any effort to procure one; that, in this attempt she struck on one of the outermost breakers and there went to pieces.

There is some contrariety of evidence as to the immediate cause of the loss of this boat. The witnesses for the plaintiffs say, that it was owing entirely to the want of steam and sufficient sails to stem the current at the entrance of the Mississippi; that in consequence of this innavigability of the boat, she drifted while in the channel and in the very act of going over the bar; while the defendants witnesses testify that, inasmuch as the boat had been able to sail about twenty miles from the place where she was offered a pilot to the Balize, any regular pilot could have taken her safely into the Mississippi that very night, because the weather was clear and the draft of the boat light, and that the running aground on the outermost breaker from the bar, can only be imputed to the inexperience of those who undertook to bring her in the next day: but for the purposes of this inquiry it matters

not absolutely what was the immediate and true cause of
this accident. The question before us, is ; has there been, in
this case, a breach of the implied warranty of seaworthiness
from the want of a competent pilot on board ? If there has
been such a breach, whether the loss has been the immediate
consequence of it or not, provided it can by any reasonable
probability be ascribed to it, the underwriters are discharged
from all liability. 2 *Phillips on Insurance,* 118 ; *Hughes,* 308 ;
1 *Marshall,* 165.

The general rule is that in every well appointed port, where
pilots are to be had, a vessel arriving upon pilotage ground is
bound to take one. The duty is the more imperative on the
approach to a river of difficult access where the navigation
requires not only nautical skill, but local knowledge and
constant practice. There are few states provided with as
good a system of pilotage as we have ; the attention of our
general assembly has been turned to the subject at a very
early period, and from its importance it has been legislated
upon from time to time up to the statute of 1837, which em-
bodies most of the regulations to be found in the former
enactments in relation to pilotage. It provides that branch-
pilots shall be appointed, not to exceed fifty in number ; that
they shall be citizens of the United States; shall have resided
two years in the country ; shall undergo an examination ;
give security for their good behaviour, and be commissioned
by the state ; their duties are pointed out, and the rates of
pilotage fixed ; and it is made penal for any person not being
a branch-pilot, to pilot any ship or vessel in or out of the Mis-
sissippi when a branch-pilot offers, &c.

Under a system of pilotage thus organized, it has not been,
nor can it be denied, that the laws and usages of this port
contemplate that all masters of vessels, when coming in or
going out of the Mississippi, are to take a pilot on board,
whenever it is practicable for them to procure one. There
are, undoubtedly, cases in which the masters, for the safety of
their ships, must take upon themselves to navigate them into
the river without the assistance of a pilot. These cases must
form exceptions to the rule, and must be adjudicated upon

according to their peculiar and respective circumstances. In the present case no stress of weather is alleged; no effort is shown to have been made to procure a pilot on the day the boat was lost; it appears on the contrary, that the services of one had been repeatedly refused the preceeding night. But the plaintiffs contend that they have discharged their warranty to the underwriters as relates to a pilot being on board, because the captain of the boat was skillful and experienced, and that it is not usual for steam-boats trading between this port and Mobile to employ the commissioned pilots. This particular usage, tending so materially to diminish the security held out to the underwriters under the customary pilotage as regulated by law, should be established clearly and beyond contradiction, and should be shown to have been acquiesced in by those who are to be affected by it. In support of such usage, the record exhibits the declarations of several captains of steam-boats; they say that it is not customary for a majority of the steam-boats engaged in the Mobile trade, to take in pilots at the Balize; that they have never employed them, or at least very seldom; and that they believe themselves as competent and as well acquainted with this navigation as any commissioned pilot. On the other hand, the defendants' witnesses represent the usage of taking pilots at the Balize as general and common to steam-boats as well as other vessels; they say that sometimes the Mobile steam-boats steal out of the river by the pass a la Loutre, to avoid taking a pilot, and that frequent accidents have been the consequence of such a course of conduct. That it is a matter of rare occurrence for steam-boats to go out or come into the river without employing a pilot like all other vessels; and that on her outward trip, the Convoy herself conformed to this general usage by taking a pilot: the agent of the pilots testifies that he has collected pilotage fees from steam-boats as from other vessels. Thus it is seen, that this usage invoked by the plaintiffs is far from being firmly established, at least not so as to warrant the presumption that insurances are effected in reference to it. The competency of the captain is attested by two seamen who have sailed under his command

at different times; they declare him to be skillful, experienced, and well acquainted with the navigation of this river. In a port like this, where there are regular pilots commissioned by the state for the safety of our shipping, our insurance offices have a right to expect that the insured will avail themselves of their services and experience. · Nothing short of the most positive and uncontradicted proof of a particular usage with regard to steam-boats in the Mobile trade, could induce us to say that the insured can discharge their warranty of seaworthiness to the insurers, by administering proof of the supposed knowledge and experience of a captain where his boat has been lost without having a pilot on board, and it was practicable to procure one. The competency of a captain would in every case be established by that kind of evidence, which is the easiest to be obtained and the least to be trusted, to wit: the opinions which men of the same calling are always found willing on occasions of this sort, to express in favor of each other. Whatever may be our respect generally for the finding of juries in matters of fact; yet, when we disagree with them, it is our province, nay, our duty, to correct their errors of fact as well as of law.

It is, therefore, ordered, adjudged and decreed, that the judgment of the District Court be reversed; and that ours be for the defendants, with costs in both courts.